# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **LARRY MCKENDALL** | **CIVIL ACTION** |
| **VERSUS** | **No. 17-11835** |
| **DITECH FINANCIAL LLC** | **SECTION I** |

## ORDER & REASONS

Before the Court is defendant Ditech Financial LLC's ("Ditech") motion[1] for summary judgment. For the following reasons, the motion is granted.

## I.

This case concerns a mortgage loan on plaintiff Larry McKendall's ("McKendall") property.[2] The loan is serviced by Ditech.[3] McKendall alleges that, in 2015, Ditech purchased a force-placed insurance policy on the property.[4] McKendall argues that Ditech wrongfully obtained the alleged force-placed insurance policy because his property was "properly insured for homeowners insurance in compliance with the mortgage contract."[5] Moreover, McKendall contends that, as a result of the force-placed insurance policy allegedly purchased, his escrow payments increased,

---

[1] R. Doc. No. 25.
[2] R. Doc. No. 1, at 2.
[3] *Id.* at 2–3.
[4] *Id.* at 3; R. Doc. No. 8, at 11. "Force-placed insurance is the insurance that a lien holder places on a property to provide coverage in the event the borrower allows the coverage to lapse or when the borrower's coverage actually lapses." *Baxter v. PNC Bank Nat'l Ass'n,* 541 F. App'x 395, 396 n.1 (5th Cir. 2013); *see also* 12 U.S.C. § 2605(k)(2).
[5] R. Doc. No. 1, at 3.

"ostensibly to cover the . . . costs of the . . . coverage."[6] The increase in his monthly payments forms the heart of this lawsuit.

Ditech does not dispute the increase in McKendall's monthly payments, but it offers an alternative explanation. Ditech contends that it advanced $6,004 to Hanover Insurance Company ("Hanover") to renew a policy that McKendall had previously selected.[7] Ditech asserts that McKendall did not request that it cancel the policy until June 9, 2015 and that—after the policy was canceled—Hanover sent McKendall a reimbursement check for $6,004.[8] McKendall retained the proceeds instead of sending the check to Ditech to be credited to his escrow account.[9] Ditech asserts that only then did it increase McKendall's monthly escrow payments—"for the purposes of satisfying the $6,004 insurance premium, the refund for which [McKendall] retained in his own bank account."[10]

## II.

Summary judgment is proper when, after reviewing the pleadings, the discovery and disclosure materials on file, and any affidavits, the Court determines that there is no genuine dispute of material fact. *See* Fed. R. Civ. P. 56. "[A] party seeking summary judgment always bears the initial responsibility of informing the

---

[6] *Id.*
[7] R. Doc. No. 25-4, at 5. Based on a review of the record, the Court concludes that the Hanover policy is the same policy McKendall refers to in his complaint. However, he claims that Ditech purchased the policy as force-placed insurance. R. Doc. No. 1, at 3.
[8] R. Doc. No. 25-2, at 2; R. Doc. No. 25-4, at 2. Ditech never specifies who canceled the policy or when. However, it is undisputed that the policy was eventually canceled and that Hanover sent McKendall a check in the amount of $6,004.
[9] R. Doc. No. 25-4, at 5.
[10] *Id.* at 8.

district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The party seeking summary judgment need not produce evidence negating the existence of a material fact; it need only point out the absence of evidence supporting the other party's case. *Id.*; *see also Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986).

Once the party seeking summary judgment carries its burden, the nonmoving party must come forward with specific facts showing that there is a genuine dispute of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The showing of a genuine issue is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted).

Instead, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Although the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible . . ., the material may be presented in a form that would not, in itself, be admissible at trial." *Lee v. Offshore Logistical and Transp., LLC*, 859 F.3d 353, 355 (5th Cir. 2017) (citations omitted).

The party responding to the motion for summary judgment may not rest upon the pleadings but must identify specific facts that establish a genuine issue.

*Anderson*, 477 U.S. at 248. The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.* at 255; *see also Hunt v. Cromartie*, 526 U.S. 541, 552 (1999).

**III.**

McKendall alleges several violations of the Real Estate Settlement Procedures Act ("RESPA"). According to Mckendall, Ditech increased his monthly escrow payments to cover the costs of an alleged force-placed insurance policy.[11] He claims that, in doing so, Ditech violated Section 2605(m) of RESPA,[12] which requires that all charges imposed on a borrower "related to force-placed insurance" be "bona fide and reasonable." 12 U.S.C. § 2605(m). McKendall characterizes the increase in his monthly payments as a charge "related to force-placed insurance" and argues that it was neither *bona fide* nor reasonable.[13]

Summary judgment is appropriate with respect to McKendall's Section 2605(m) claim because there is no evidence in the record that suggests Ditech purchased force-placed insurance on McKendall's property. Instead, the evidence shows that, in March 2014, McKendall selected a hazard insurance policy through Hanover.[14] Then, in March 2015, Ditech advanced $6,004 to Hanover to renew that policy.[15] McKendall alleges that this 2015 renewal was force-placed; however, *he*

---

[11] R. Doc. No. 1, at 3.
[12] *Id.*
[13] *Id.* at 3–4.
[14] R. Doc. No. 25-2, at 2.
[15] *Id.*

4

selected the policy one year earlier.[16]

The evidence also demonstrates that McKendall had a new policy with another insurance company, Lighthouse Property ("Lighthouse").[17] Consequently, McKendall requested that Ditech cancel the Hanover policy.[18] In a letter to McKendall detailing this course of events, Ditech noted that it immediately sought to cancel the Hanover policy upon his request.[19] The letter also pointed out that the $6,004 refund was sent directly to McKendall, who concedes that he deposited the check.[20] According to a Ditech corporate litigation representative, "McKendall refused to forward the refund proceeds" to the company.[21]

After McKendall chose not to endorse the check to Ditech to be credited to his escrow account, "an escrow analysis was performed to determine whether the monthly escrow payments needed to be adjusted."[22] In July 2015, McKendall's escrow balance reflected a deficiency "as a direct result of the $6,004 disbursement to

---

[16] McKendall also "seeks an accounting of the escrow account and a refund" under 12 C.F.R. § 1024.37. Subsection (g)(2) of this regulation requires that, upon receipt of "evidence demonstrating that the borrower has had in place hazard insurance coverage that complies with the loan contract's requirements," a loan servicer must "refund to such borrower all force-placed insurance premium charges and related fees paid by such borrower." 12 C.F.R. § 1024.37(g)(2). The record indicates that McKendall received a refund check from Hanover and deposited the check into a personal account. *See* R. Doc. No. 25-1, at 4, 16. Therefore, even if the Court concluded that the policy was purchased as force-placed insurance, McKendall has already been refunded.
[17] *Id.* at 11.
[18] *Id.* at 21.
[19] *Id.*
[20] *Id.* at 4, 16.
[21] R. Doc. No. 25-2, at 3.
[22] R. Doc. No. 25-1, at 21.

5

Hanover Insurance and the fact that the refund in that amount was sent directly to [him]."²³ That "deficiency amount was spread over 36 months"—hence the increase in McKendall's monthly payments.²⁴

McKendall has not offered any evidence disputing this explanation of the increase in his escrow payments. In fact, his evidence establishes the following timeline of events:

- On February 9, 2015, McKendall's 2014 Hanover insurance policy was renewed for 2015–2016.²⁵
- On March 1, 2015, Hanover sent McKendall a statement with respect to that policy showing an outstanding balance of $6,004.²⁶
- On March 10, 2015, McKendall's insurance agent faxed Ditech

---

²³ *Id.* at 22.
²⁴ *Id.*
²⁵ *Id.* at 13. McKendall contends that Ditech "purchase[d]" the Hanover policy. R. Doc. No. 37, at 2. And while the record does not make clear who renewed it, it *is* clear that the policy was renewed—not newly purchased—and that McKendall was the one who previously chose the policy. *See* R. Doc. No. 25-2, at 2 (an affidavit from a Ditech corporate litigation representative stating, "Beginning in March 2014, McKendall selected a hazard insurance policy through . . . Hanover"); R. Doc. No. 37-1, at 4 (a letter from Ditech to McKendall explaining that Ditech's records "show that Hanover [] had been [McKendall's] insurance carrier since March 2014"); *id.* at 31 (a letter from McKendall to a Ditech paralegal noting that, the year before the 2015 renewal, he "had paid Hanover $3,807.00 for an [i]nsurance policy").
²⁶ R. Doc. No. 25-1, at 9. McKendall appears to misunderstand this account statement. In multiple letters to Ditech, he claims that Ditech's contention that it paid a premium on the Hanover policy on March 20, 2015 cannot be correct because the March 1, 2015 statement shows "that between February 10, 2015 and March 1, 2015 Hanover had place[d] $6,004.00 into an account they had for [him]." *See, e.g.*, R. Doc. No. 37-1, at 31. But the statement does not show a $6,004 deposit: it shows a $6,004 *balance*. R. Doc. No. 25-1, at 9. McKendall thus *owed* $6,004. The statement notes, "This is not a bill. Request for payment has been sent to the following mortgage company" and then lists Green Tree Servicing, LLC, which is Ditech's former name. *Id.* (To avoid confusion, the Court will hereinafter refer to Green Tree as Ditech.) This comports with Ditech's assertion and the other evidence in the record suggesting that Ditech did not pay Hanover $6,004 until later in March 2015. *E.g., id.* at 15 (a letter from Ditech to McKendall explaining that an escrow disbursement for $6,400 was made to Hanover on March 20, 2015).

the declaration for his new insurance policy with Lighthouse.[27] The policy went into effect on March 26, 2015.[28]
- Sometime in March, Ditech made disbursements to both Hanover and Lighthouse out of McKendall's escrow account.[29]
- On March 11, 2015, the Hanover policy was canceled, effective March 26, 2015.[30]
- On April 14, 2015, Hanover sent McKendall a check refunding him the $6,004 premium, which he deposited on April 27, 2015.[31]
- On April 29, 2015, Ditech sent McKendall a letter notifying him that it "ha[d] recently received evidence of insurance" under the Lighthouse Policy. The letter explained:

> Ditech's "records show that the . . . policy is a policy purchased in addition to your existing insurance policy. Premiums for both policies may have been paid from your escrow account. If you do not intend to have two policies, *you are responsible to*: (1) Cancel the incorrect policy (2) Request a refund of the unearned premium and send that refund to [Ditech] to be applied to your escrow account [and] (3) Provide evidence of the policy cancellation.
>
> R. Doc. No. 25-1, at 17. The letter also provided a mailing address where the refund check could be sent.

The Court concludes that there is no genuine issue of material fact regarding whether Ditech imposed any charges on McKendall related to force-placed insurance.

---

[27] *See* R. Doc. No. 25-1, at 10 (a letter to McKendall from his insurance agent explaining that "[it] appears on 3/10 [the company] faxed your mortgage company [Ditech] an invoice and declaration page of the rewrite policy with Lighthouse").
[28] *Id.* at 11.
[29] It is clear that payment was made to Hanover on March 20, 2015. *See id.* at 15, 21. However, Ditech's records make it difficult to discern when the disbursement was made to Lighthouse. For example, in an October 2015 letter to McKendall, Ditech explains that it made an escrow disbursement for $3,646 to Lighthouse on March 10, 2015. *Id.* at 21. But an April 2015 account statement Ditech sent McKendall suggests a payment for $3,646 was sent on March 19, 2015. *See id.* at 15.
[30] *Id.* at 14. Notice of an intention to cancel the policy appears to have been given on March 11, 2015, but the cancelation did not go into effect until March 26, 2015. *Id.*
[31] *Id.* at 16.

7

Regardless of when and who canceled the Hanover policy, the evidence submitted makes clear that the policy was not purchased as force-placed insurance and that Hanover refunded the $6,004 premium directly to McKendall, who then deposited the check. Summary judgment is therefore appropriate with respect to the Section 2506(m) claim.

McKendall also alleges that Ditech violated Section 2506(e)(3) of RESPA by "furnish[ing] information regarding the disputed payments to credit bureaus."[32] Section 2605(e) sets forth a loan servicer's responsibilities when responding to inquiries from a borrower:

> During the 60-day period beginning on the date of [a loan] servicer's receipt from any borrower of a qualified written request relating to a dispute regarding the borrower's payments, a servicer may not provide information regarding any overdue payment, owed by such borrower and relating to such period or qualified written request, to any consumer reporting agency. . . .

12 U.S.C. § 2605(e)(3). In his complaint, McKendall contends that he submitted "a written notice of error" (to use the language from the statute, a "qualified written request") to Ditech disputing the amount it claimed was past due on his account.[33] He alleges that Ditech nonetheless continued furnishing information to consumer reporting agencies during the 60 days following receipt of his request in violation of Section 2605(e)(3).[34]

Ditech argues that this claim is preempted and governed by the Fair Credit

---

[32] R. Doc. No. 1, at 4.
[33] *Id.* at 4.
[34] *Id.*

8

Reporting Act ("the FCRA").[35] However, Ditech cited no authority for this proposition in its motion for summary judgment, so the Court ordered additional briefing on the issue. After reviewing Ditech's supplemental brief and the relevant case law, the Court finds that Ditech has still not provided the Court with legal authority sufficient to support its position that RESPA claims under Section 2605(e)(3) are preempted by the FCRA.[36]

Ditech also argues in its supplemental brief that McKendall has provided no evidence demonstrating "that he submitted any written communication to Ditech that would qualify as notice of error" under Section 2605(e)(3).[37] For any of McKendall's letters to Ditech to constitute a "qualified written request," they must have enabled Ditech to "identify the name and account of the borrower" and have "include[d] a statement of the reasons for the borrower's belief that the account is in error, or provide[d] sufficient detail to the servicer regarding other information sought by the borrower." *Williams v. Wells Fargo Bank, N.A.*, 560 F. App'x 233, 238 (5th Cir. 2014) (citing 12 U.S.C. § 2605(e)(1)(B)).

McKendall has had extensive contact with Ditech over the last several years, much of which may constitute qualified written requests. For example, in July 2016, McKendall wrote a complaint to Ditech that generally explains his grievance related to the Hanover account and referencing specific insurance policy numbers.[38]

---

[35] R. Doc. No. 25-4, at 8–9.
[36] The FCRA does preempt certain state law claims. *See Young*, 294 F.3d at 638. But RESPA is a federal statute.
[37] R. Doc. No. 34, at 2 n.2.
[38] R. Doc. No. 37-1, at 31–32.

9

Nonetheless, McKendall's claim fails. He has not provided any evidence demonstrating that Ditech continued to provide disputed information to any particular consumer reporting agency in violation of Section 2605(e)(3).[39]

**IV.**

McKendall also asserts claims against Ditech under Section 1681s–2(b) of the FCRA,[40] which "explains a furnisher's responsibilities after a credit reporting agency has notified the furnisher of a consumer dispute regarding information provided by the furnisher." *Desselle v. Ford Motor Credit Co., LLC*, No. 14-1147, 2014 WL 4635545, at *3 (E.D. La. Sept. 15, 2014) (Fallon, J.). Ditech concedes that it is a "furnisher" under the statute.[41] After receiving notice of a dispute,

> furnishers are required to (1) investigate disputed information; (2) review all information provided by the consumer reporting agency in conducting the investigation; (3) report the results of the investigation to the consumer reporting agency; and (4) report the results to all national consumer reporting agencies if the investigation finds the information given is incomplete or inaccurate.

*Shelley v. New Penn Fin. LLC*, No. 17-11349, 2018 WL 1070119, at *4 (E.D. La. Feb. 27, 2018) (Zainey, J.) (citing 15 U.S.C. § 1681s–2(b)).

McKendall alleges that Ditech violated Section 1681s–2(b)(1)(A) "by failing to

---

[39] In his complaint, McKendall asserts a violation of 12 C.F.R. § 1024.35(i) alongside his Section 2605(e)(3) claim. R. Doc. No. 1, at 4. Under that regulation, "[a]fter receipt of a notice of error, a servicer may not, for 60 days, furnish adverse information to any consumer reporting agency regarding any payment that is the subject of the notice of error." 12 C.F.R. § 1024.35(i). This claim fails for the same reasons that McKendall's Section 2605(e)(3) claim fails: there is no evidence in the record showing that Ditech furnished "adverse information" to a consumer reporting agency after it received notice of his dispute.

[40] *See* R. Doc. No. 1, at 5–7.
[41] R. Doc. No. 25-4, at 6.

fully and properly investigate [his] disputes."[42] McKendall claims that he disputed his escrow account with unnamed credit reporting agencies using an automated system.[43] He contends that the system then automatically forwarded information about the disputes on to Ditech.[44]

Additionally, McKendall alleges that Ditech violated Sections 1681s–2(b)(1)(C) and (D). Under subsection (A), as explained herein, a furnisher must investigate disputed information once it receives notice of such a dispute from a credit reporting agency. Subsections (C) and (D) require furnishers to "report the results of the investigation to the credit reporting agency" to which they provided the disputed information. § 1681s–2(b)(1)(C). "[I]f the investigation finds that the information is incomplete or inaccurate, the furnisher must "report those results to all *other* credit reporting agencies to which [it] furnished the information. . . ." § 1681s–2(b)(1)(D) (emphasis added). According to McKendall, Ditech knew that he disputed his escrow account and nonetheless furnished information to various credit reporting agencies without notifying them that the account was disputed and without correcting the allegedly inaccurate information.[45]

Ditech argues that summary judgment with respect to these claims is justified because the FCRA does not provide McKendall with a private right of action. In its present motion, Ditech cites another section of this Court for the proposition that,

---

[42] R. Doc. No. 1, at 5.
[43] *Id.*
[44] *Id.*
[45] *Id.* at 6–7.

11

"[b]ecause enforcement of Section 1681s–2(a) is governed exclusively by . . . government entities, 'plaintiffs have no private right of action' under that provision."[46] But McKendall alleges violations under Section 1681s–2*(b)*, not (a), so that case is inapplicable.

Alternatively, Ditech argues that—even if McKendall's claims under the FCRA are actionable—they fail as a matter of law. In *Young v. Equifax Credit Information Services, Inc.*, the Fifth Circuit held that a plaintiff's failure to proffer evidence that the defendant received notice of his disputed account from a credit reporting agency was fatal to the plaintiff's claims under Section 1681s–2(b). 294 F.3d 631, 639–40. (5th Cir. 2002).

In *Young*, the Fifth Circuit explained that, if a private right of action exists under Section 1681s–2(b),[47] it "require[s] proof that a *consumer reporting agency* . . . notified [the defendant]" about any disputed information "pursuant to § 1681i(a)(2)." *Young*, 294 F.3d at 639 (citation omitted). Under that Section, if a credit reporting agency receives notice of a dispute from a customer, the agency has a duty to notify whomever provided the information, *i.e.*, the furnisher (in this case, Ditech). 12 U.S.C. § 1681i(a)(2)(A). Notice from the credit reporting agency is "necessary to trigger the

---

[46] R. Doc. No. 25-4, at 6 (citing *Floyd v. Wells Fargo Home Mortg. Co.*, 848 F. Supp. 2d 635, 642 (E.D. La. 2012) (Barbier, J.)).
[47] In *Young*, the Fifth Circuit declined to decide whether a private right of action exists against a furnisher of information. *Young*, 294 F.3d at 639. However, later, in a non-precedential opinion, the Fifth Circuit recognized such an action. *Jett v. Am. Home Mortgage Servicing, Inc.*, 614 F. App'x 711, 713 (5th Cir. 2015) (per curiam) (explaining that "[t]he Fair Credit Reporting Act creates a private cause of action to enforce § 1681s–2(b)").

furnisher's duties under Section 1681s–2(b)." *Young*, 294 F.3d at 639. In short, to survive summary judgment on his Section 1681 s–2(b) claim, McKendall must satisfy this threshold "notice element" by demonstrating that, after he notified a credit reporting agency about his dispute, the credit reporting agency then notified Ditech. *Young*, 294 F.3d at 639.

No genuine issue of material fact exists regarding whether Ditech received such notice. In his complaint, McKendall claims that he notified unidentified credit reporting agencies about his dispute.[48] He further asserts that one such credit agency "forwarded [the] dispute of his credit information to Ditech" using an automated consumer dispute verification form.[49] However, Ditech argues that McKendall "has not substantiated his allegation that Ditech received any information about his dispute to any [credit reporting agency]."[50] The Court agrees.

McKendall has not specified which credit reporting agency forwarded information about his dispute to Ditech or provided proof thereof. Indeed, he has offered no evidence at all to support this allegation. While he did submit reports indicating that certain credit reporting agencies knew he disputed his escrow account,[51] he has failed to proffer evidence that those agencies subsequently gave the requisite notice to Ditech. *Fagan v. Lawrence Nathan Assocs., Inc.*, 957 F. Supp. 2d 784, 799 (E.D. La. July 9, 2013) (Brown, J.) ("Plaintiffs have . . . failed to point to any

---

[48] R. Doc. No. 1, at 5.
[49] *Id.*
[50] R. Doc. No. 25-4, at 7.
[51] *See* R. Doc. No. 37-1, at 14, 27 (showing that Experian and Equifax were notified that McKendall disputed his account with Ditech).

13

evidence . . . that Defendant received notice of a dispute from Equifax or Experian . . . as is required to trigger Defendants' duties under Section 1681s-(b).").

To survive a motion for summary judgment, McKendall cannot establish a genuine issue of fact using "conclusory allegations" or "unsubstantiated assertions." *Little*, 37 F.3d at 1075 (citations omitted). After Ditech met its initial burden by "identifying those portions of the record . . . demonstrat[ing] the absence of a genuine issue of material fact," the burden shifted to McKendall to show that summary judgment should not be granted on his claims. *See Hardy v. Shell Chemical Co.*, 693 F. Supp. 2d 611, 617 (E.D. La. Mar. 1, 2010) (Africk, J.). McKendall has failed to do so, and the Court concludes that summary judgment is warranted.[52]

## V.

Accordingly,

**IT IS ORDERED** that Ditech's motion for summary judgment is **GRANTED** and that McKendall's claims against Ditech in the above-captioned matter are **DISMISSED WITH PREJUDICE**.

New Orleans, Louisiana, July 30, 2018.

---

[52] Ditech also cites the U.S. Supreme Court cases *Bell Atlantic Corp. v. Twombly* and *Ashcroft v. Iqbal* to argue that McKendall has not stated a claim for relief. R. Doc. No. 25-4, at 3–4. However, those cases are not relevant to a motion for summary judgment. *Twombly* and *Iqbal* clarified the pleading standard required under Federal Rule of Civil Procedure 8. *See Int'l Energy Ventures Mgmt., L.L.C. v. United Energy Grp., Ltd.*, 818 F.3d 193, 203 (5th Cir. 2016). Therefore, the Court does not consider them in determining whether summary judgment is warranted with respect to McKendall's claims.

**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**